## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHNNY DENNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-15-158-JHP |
| | ) | |
| BOARD OF COUNTY | ) | |
| COMMISSIONERS OF LOVE | ) | |
| COUNTY, OKLAHOMA, and JOE | ) | |
| RUSSELL, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANT BOARD OF COUNTY COMMISSIONERS OF LOVE COUNTY, OKLAHOMA'S MOTION FOR SUMMARY JUDGMENT

---

Jordan L. Miller, OBA No. 30892
Chris J. Collins, OBA No. 1800
COLLINS, ZORN & WAGNER, P.C.
429 NE 50th, Second Floor
Oklahoma City, Oklahoma 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: Jordan@czwglaw.com
       cjc@czwglaw.com

Attorneys for Defendant

April 1, 2016

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-v

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi-vii

LCvR 56.1(b) STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT AND AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     I.      STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     II.     DEFENDANT BOARD IS NOT A
            PROPER PARTY TO PLAINTIFF'S
            FEDERAL CAUSE OF ACTION FOR
            A DUE PROCESS VIOLATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     III.    DUE PROCESS VIOLATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     IV.    BURK TORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     V.     OKLAHOMA GOVERNMENT
            TORT CLAIMS ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     VI.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITY

**CASES**                                                                                     **PAGE**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Allen v. Board of Com'rs of Pittsburg County*, 116 P.175 (Okla. 1911). . . . . . . . . . . . . . . . . . . 13

*Beers v. Ballard*, 04–CV–0860–CVE–SAJ, 2005 WL 3578131 at *6
    (N.D. Okla. Dec. 29, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brandon v. Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). . . . . . . . . . . . . 14

*Brewer v Baptist's Inc.*, 2012 WL 5499633, at *8 (W.D. Okla., 2012). . . . . . . . . . . . . . . . . . . . 22

*Bunger v. University of Oklahoma Board of Regents*, 95 F.3d 987 (10th Cir. 1996). . . . . . . . . 18

*Crockett v. Central Okla. Transp. & Parking Auth.*, 231 P.3d 748
    (Okla. Civ. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cruse v. Bd. of Cnty Comm'rs of Atoka Cnty.*, 910 P.2d 998, 1004-05 (Okla. 1995). . . . . . . . . 24

*Curtis Ambulance v. Shawnee City Board of County Commissioners*,
    811 F.2d 1371, 1377 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Darr v. Town of Telluride, Colo*, 495 F.3d 1243 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 18

*Fuller v. Odom*, 1987 OK 64, ¶ ¶ 3-4, 741 P. 2d 449. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Goss v. Bd. of Cnty. Comm'rs of Creek Cnty.*, 2014 WL 4983856, at *6
    (N.D. Okla. Oct. 6, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,17

*Hennigh v. City of Shawnee*, 155 F.3d 1249 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Houston v. Reich*, 932 F.2d 883, 887 (10th Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jantzen v. Bd. of County Comm'rs of Canadian County*,
    188 F.3d 1247 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15

*Jantzen v. Hawkins*, 188 F.3d 1247 (10th cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kruchowski v Weyerhaeser Co.*, 2008 OK 105, 202 P.3d 144. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lacher v. Bd. of Cnty. Comm'rs for Okla Cnty ex rel. Okla. Cnty. Clerk's Office*,
    2013 WL 268983 at *4(W.D. Okla., Jan. 24, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 15,17

*Lairmore v. Board of Com'rs, Okmulgee County*, 195 P.2d 762 (Okla. 1948). . . . . . . . . . . . .  14

*Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15,16

*Moore v. Oklahoma State University*, 255 P.3d 442, 446, 2011 OK CIV APP 49, ¶ 17
    (Okla .Civ.App. Div. 2,2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

 *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292,
    89 L.Ed.2d 452 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rusillo v. Scarborough*, 935 F.2d 1167 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State ex rel. Tharel v. Board of Com's of Creek County*, 107 P. 542 (Okla. 1940). . . . . . . . . . . 14

*Vasek v. Board of County Commissioners*, 2008 OK 35, ¶ ¶ 27-28, 186 P. 3d 928. . . . . . . . . . 21

*Williams v. Berney*, 519 F.3d 1216 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## **RULES**

Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## **STATUES**

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14,15,16,17

Okla. Stat. tit. 15, § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Okla. Stat. tit. 15, § 51. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Okla. Stat. tit. 19, § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Okla. Stat. tit. 19, § 339. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,16

Okla. Stat. tit. 19, § 513. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

Okla. Stat. tit. 19, § 547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,16

Okla. Stat. tit. 19, § 547(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Okla. Stat. tit. 22, § §1181-1196. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Okla. Stat. tit 51, § 152.1(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Okla. Stat. tit. 51, § 152.1(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Okla. Stat. tit. 51, § 153(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Okla. Stat. tit. 51, § 156(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Okla. Stat. tit. 51, § 157(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Okla. Stat. tit. 51, § 157(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

## LIST OF EXHIBITS

Exhibit 1:      Excerpts from the Deposition of Plaintiff Denney

Exhibit 2       Employment Application

Exhibit 3       Employee Personnel Record

Exhibit 4:      Excerpts from the Deposition of Sheriff Russell

Exhibit 5       Employee Personnel Policy Handbook Acknowledgment Form

Exhibit 6       2010 Employee Personnel Policy Handbook

Exhibit 7:      2013 Employee Personnel Policy Handbook

Exhibit 8:      Statement of Sheriff Russell

Exhibit 9:      Statement of John Nipp

Exhibit 10:     Affidavit of Cody Blagg

Exhibit 11      Affidavit of Harvey Stewart

Exhibit 12:     Affidavit of Larry Vaughn

Exhibit 13:     January 21, 2014 Employment Action

Exhibit 14:     Tort Claim

Exhibit 15      Lacher v. Bd. of Cnty. Comm'rs for Okla Cnty ex rel. Okla. Cnty. Clerk's Office, 2013 WL 268983 at *4(W.D. Okla., Jan. 24, 2013)

Exhibit 16:     Goss v. Bd. of Cnty. Comm'rs of Creek Cnty., 2014 WL 4983856, at *6 (N.D. Okla. Oct. 6, 2014)

Exhibit 17      Brewer v. Baptist's Inc., 2012 WL 5499633, at *8 (W.D.Okla.,2012

Exhibit 18:     AT&T Records from Denney's cell phone number

Exhibit 19:     CLEET Notice of Change of Address

Exhibit 20      Driver Employment Application

Exhibit 21:        Navy UTC Conversion Chart

Exhibit 22         Explanation of when Central Standard Time would have converted into Daylight
                   Savings time in 2014, not until March 9, 2014

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOHNNY DENNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-15-158-JHP |
| | ) | |
| BOARD OF COUNTY | ) | |
| COMMISSIONERS OF LOVE | ) | |
| COUNTY, OKLAHOMA, and JOE | ) | |
| RUSSELL, in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT BOARD OF COUNTY COMMISSIONERS OF LOVE COUNTY, OKLAHOMA'S MOTION FOR SUMMARY JUDGMENT

Defendant Board of County Commissioners for Love County, Oklahoma (hereinafter referred to as Defendant "Board") requests that this Court grant summary judgment in its favor as to all claims alleged against it pursuant to Fed. R. Civ. P. 56, as set forth in the following Brief.

## LCvR 56.1(b) STATEMENT

Pursuant to LCvR 56.1(b), Defendant Board asserts that there is no genuine dispute as to the following material facts:

1.     On October 24, 2012, Plaintiff Johnny Denney ("Denney" or "Plaintiff") submitted an employment application to the Love County Sheriff's Office. Even in his application, Denney signed that he understood and agreed that his employment could be terminated at any time for any reason not prohibited by law. (See Exhibit 1, Deposition of Denney, 54:13-55:20; Exhibit 2, Employment Application).

2.     Denney was hired by Love County Sheriff Joe Russell ("Russell") as a Deputy Sheriff on approximately August 28, 2012. (See Exhibit 1, Deposition of Denney, 63:10-64:9; Exhibit 3, Employee Personnel Record; Exhibit 4, Deposition of Sheriff Russell, 111:1-111:19).

3.      On August 31, 2012, Denney signed an employee personnel policy handbook acknowledgment form.  The form stated: "I further understand this handbook is not nor is it intended to be a contract of employment.  I further understand the county elected officer retains the right of employment-at-will to terminate his or her employees at any time for any reason not prohibited by federal, state or municipal law, and also employees can terminate at will."  Denney understood that he was an employee-at-will.  (See Exhibit 1, Deposition of Denney, 65:21-66:24; Exhibit 5, Employee Personnel Policy Handbook Acknowledgment form).

4.      Denney agrees that the policy at the Love County Sheriff's Office at all relevant times was that "Love County offers no employment contracts nor does it guarantee any minimum length of employment.  Just as any employee may terminate employment at any time, so may Love County terminate an employee at any time 'at-will,' with or without cause, with or without notice."  (See Exhibit 1, Deposition of Denney, 68:8-70:9; Exhibit 6, 2010 Employee Personnel Policy Handbook, Exhibit 7, 2013 Employee Personnel Policy Handbook).

5.      Denney was approved to be a canine officer in July of 2013, working with a German Shepherd named Coach.  (See Exhibit 1, Deposition of Denney, 88:19-89:5; Exhibit 4, Deposition of Russell, 119:2-119:19).

6.      Prior to January 20, 2014, Sheriff Russell never told Denney that he could not arrest anybody.  (See Exhibit 1, Deposition of Denney, 96:18-96:23).

7.      Prior to January 20, 2014, Denney never made any complaints to anyone about the way the Love County Sheriff's Office was run.  (See Exhibit 1, Deposition of Denney, 79:14-79:18).

8.      On January 20, 2014, at about 10:40 p.m. Denney was called by dispatch, saying that the Oklahoma Highway Patrol needed his assistance with his canine in a pursuit on Oswalt Road. (See Exhibit 1, Deposition of Denney, 104:6-105:12, 109:13-109:15).

2

9.      Denney left his house after receiving this call, wearing a T-shirt and Nike Wind pants. He was not wearing a uniform of any type, and did not have his badge.  (See Exhibit 1, Deposition of Denney, 109:21-110:18).

10.      As Denney was headed toward the area of Oswalt Road, he heard on the radio that the driver of the vehicle had been identified as James Con Nipp ("Con Nipp").  (See Exhibit 1, Deposition of Denney, 114:23-116:19).

11.      Oklahoma Highway Patrol Trooper Brian Quinn ("Quinn") told Denney over the radio that  Denney and his canine were needed at the Nipp residence on Long Hollow Road.  (See Exhibit 1, Deposition of Denney, 119:2-119:23).

12.      Denney drove to the Nipp residence, exited his patrol car with his canine, and walked toward the Nipp residence.  As Denney approached the residence, he got into a verbal altercation with  Con Nipp and Con Nipp's dogs.  Con Nipp was cursing and being belligerent, and then turned around to go back inside the residence. (See Exhibit 1, Deposition of Denney, 121:20-123:5, 125:4-128:15, 130:2-131:2).

13.      Denney followed Con Nipp into the residence, where the lights were on and Denney saw several subjects in the house.  Denney detained and handcuffed Con Nipp, taking him back out to Denney's patrol vehicle.   (See Exhibit 1, Deposition of Denney, 131:17-137:19).

14.      Denney walked back to the residence to enter the house a second time.  Denney testified that as he attempted to open the door, that the door was slammed back into him  on  his wrist, and that somebody then tried to hold the door closed to keep him out of the residence.  (See Exhibit 1, Deposition of Denney, 139:11-141:20).

15.      As he entered the house, Denney did not knock on the door or announce who he was. (See Exhibit 1, Deposition of Denney, 154:11-154:25).

3

16.     Denney testified that he forced the door open, and was struck in the side of the head, knocking Denney's glasses off. (See Exhibit 1, Deposition of Denney, 143:24-145:15).

17.     Denney claims he could not immediately tell who had punched him in the face, just that it was a "person that was standing in front of me." (See Ex. 1, Depo of Denney, 145:16-145:24).

18.     Denney claims that he then "engaged the subject" by hitting the individual with both closed fists at least two or three times, knocking the individual over a couch onto the floor.  (See Exhibit 1, Deposition of Denney, 150:2-151:14, 152:16-153:10).

19.     Denney's eyes were open for at least part of this period, (See Exhibit 1, Deposition of Denney, 157:5-157:19).

20.     Denney testified that Trooper Quinn grabbed the individual's hands and told him to stop hitting, at which point Denney put his glasses back on.  Denney claims he did not realize who had been hitting until this point; the individual turned out to be John Nipp (Con Nipp's grandfather), an elderly blind resident of the house who does not have any eyes.  (See Exhibit 1, Deposition of Denney, 153:14-154:1, 155:1-156:23).

21.     Denney did not handcuff John Nipp at this point, but rather went outside of the residence and contacted Sheriff Joe Russell and Undersheriff Harvey Stewart ("Stewart") to come to the scene.  (See Exhibit 1, Deposition of Denney, 162:24-163:14, 164:23-165:13).

22.     Denney informed Sheriff Russell that there had been an altercation and fist fight between Denney and John Nipp when John Nipp tried to slam the door in Denney's face.  Sheriff Russell's testimony was that Denney said "Me and John Nipp just had a fucking fist fight," and that when Denney was reminded that John Nipp was blind, Denney responded "I don't give a fuck because he shut the door in my face." (See Exhibit 1, Deposition of Denney, 171:23-172:24; Exhibit 4, Deposition of Russell, 157:18-158:9; Exhibit 8, Statement of Sheriff Russell).

4

23.     John Nipp is Sheriff Russell's uncle; Con Nipp is Sheriff Russell's second cousin. (See Exhibit 1, Deposition of Denney, 178:21-178:24; Exhibit 4, Depo. of Russell, 112:1-112:17).

24.     After speaking with Denney, Sheriff Russell went to speak with John Nipp.  John Nipp told Russell that Trooper Quinn had told him [John Nipp] that they had chased a blue pickup truck to the house.   John Nipp further told Russell that he [John Nipp] believed the driver of the pickup could have been a murderer or anyone, that he [John Nipp] had gone to lock the front door when the door was pushed in and John Nipp fell back against the wall, and that Denney had hit John Nipp, before John Nipp swung back. (See Exhibit 4, Depo. of Russell, 158:12-159:16, 173:11-173:13; Exhibit 9, Statement of John Nipp).

25.     Sheriff Russell testified that he had spoken with both law enforcement officials (Love County Deputy Cody Blagg and Trooper Brian Quinn) who had been in the proximity of the altercation between Denney and John Nipp, and that both Blagg and Quinn told Russell that they did not know who had hit who first.  (See Exhibit 4, Deposition of Russell, 164:7-165:11)

26.     Sheriff Russell came outside and spoke with Denney again.  Denney very loudly told Sheriff Russell he wanted to arrest John Nipp for assaulting a police office (namely Denney himself). (See Exhibit 1, Deposition of Denney, 173:19-174:6; 174:21-175:8).

27.     Denney was in a state that Russell had "never seen in him before."  (See Exhibit 4, Deposition of Russell, 171:15-171:22).

28.     Denney agrees that Sheriff Russell had no problem with the arrest that evening of Con Nipp, who is not blind and has eyes, and who is also related to Sheriff Russell.  (See Exhibit 1, Deposition of Denney, 178:25-179:11).

29.     Con Nipp has been arrested several times by the Love County Sheriff's Office, as have several other members of Sheriff Russell's family, including Travis Nipp for DUI, and other

5

cousins for rape and possession of marijuana, and even Sheriff Russell's own son Willie, for domestic assault.  (See Exhibit 4, Deposition of Russell, 28:13-28:17, 124:5-128:7).

30.     Sheriff Russell has even personally arrested Con Nipp four separate times.  (See Exhibit 4, Deposition of Russell, 242:1-242:12).

31.     Sheriff Russell has never not arrested someone because they are related to him; he is related to many people in Love County.  (See Exhibit 4, Deposition of Russell, 242:16-243:10).

32.     Sheriff Russell told Denney that they should wait until the a.m. to get a warrant as the Love County Jail facility was not capable of holding a blind man.  (See Exhibit 1, Deposition of Denney, 175:17-176:15, 177:24-178:3, 179:16-179:25; Exhibit 4, Deposition of Russell, 165:25-166:8).

33.     Russell has a duty to protect inmates in his charge, and was concerned about putting a very big liability on the Sheriff's Office if a blind man were to fall and hurt himself in the Love County Jail.  (See Exhibit 4, Deposition of Russell, 170:23-171:7, 256:3-256:14).

34.     No blind person has ever been housed at the Love County Jail.  (See Exhibit 1, Deposition of Denney, 208:13-208:25; Exhibit 4, Deposition of Russell, 252:5-252:9).

35.     The Love County Jail is a very, very small facility, without any available padded rooms.  (See Exhibit 1, Depo. of Denney, 209:1-209:11; Ex 4, Depo. of Russell, 250:24-251:8, 255:14-255:16).

36.     There is no nurse, infirmary, or doctor in the Love County Jail, so if an inmate injures themself, they have to be taken to the hospital.  (See Exhibit 4, Deposition of Russell, 69:23-70:8).

37.     Denney was nevertheless excited and worked up, and really wanted to arrest John Nipp and take him to jail.  (See Exhibit 1, Deposition of Denney, 180:1-180:22).

38.     Russell at this point attempted to call the District Attorney several times, but could

6

not get a hold of him at first.  Denney testified that when he could not immediately arrest John Nipp, he very loudly and argumentatively yelled at Sheriff Russell "If you're not going to let us do our fucking jobs, we should all fucking quit" and tossed his key fob to his Sheriff's Office patrol vehicle on the hood.  (See Exhibit 1, Deposition of Denney, 183:19-185:1, 185:23-186:5, 306:15-306:23; (See Exhibit 4, Deposition of Russell, 166:10-166:15).

39.     Denney does not, however, recall the exact words that were exchanged between him and Sheriff Russell.  (See Exhibit 1, Deposition of Denney, 290:2-290:7).

40.     Sheriff Russell testified that Denney rudely and loudly said: "Fuck it, I quit" or "Well, fuck it, then, I quit" and threw his key fob on the hood of the vehicle, and walked off.  (See Exhibit 4, Deposition of Russell, 167:18-167:21, 177:1-177:5, 257:23-258:15).

41.     Denney does not know whether Sheriff Russell perceived that he (Denney) had just quit his job.  Based on Denney's words, tone, and actions with the key fob, Russell in fact did perceive that Denney had just quit his job. (See Exhibit 1, Deposition of Denney, 204:20-204:24; Exhibit 4, Deposition of Russell, 177:6-177:10, 203:2-203:8, 258:16-259:15).

42.     Deputy Cody Blagg and Undersheriff Harvey Stewart both testified that they also viewed this incident, and perceived that Denney had quit his job as a Love County Deputy.  (See Exhibit 10, Affidavit of Cody Blagg; Exhibit 11, Affidavit of Harvey Stewart)

43.     Russell did not terminate Denney.  (See Exhibit 4, Depo. of Russell, 196:7-196:9).

44.     Reserve Deputy Larry Vaughn testified that he overheard Denney on the cell phone with someone, saying "that he [Denney] needed a ride because he had just quit his job."  While Denney claims he did not even have his cell phone on him, the cell phone records from Denney's cell phone number (580)768-1075 indicate that Denney made and received numerous calls on his cell phone between 10:37 p.m. on January 20, 2014 and 12:46 a.m. on January 21, 2014, including

7

to his wife's cell phone number (580) 768-0896.  (See Exhibit 12, Affidavit of Larry Vaughn; Exhibit 18, AT& T Records from Denney's cell phone number, pp. 1-2; Exhibit 19, CLEET Notice of change of Address, p. 1; Exhibit 20, Driver Employment Application, p. 1).[1]

45.     Russell then finally got a hold of Tim Burson ("Burson") from the District Attorney's Office on Stewart's cell phone;  Burson told Russell  "do not let him arrest that blind man....have him fill out a report and bring it to me," to which Russell replied that Denney had quit, but was still standing there.  (See Exhibit 4, Deposition of Russell, 167:22-168:16).

46.     Sheriff Russell told Reserve Deputies Larry Vaughn and Brett Harris that one of them needed to drive Denney's patrol car back to the Sheriff's Office, as Denney had just quit.  (See Exhibit 4, Deposition of Russell, 169:10-169:17, 177:10-178:5; Exhibit 12, Affidavit of Larry Vaughn).

47.Larry Vaughn did not have the opportunity to actually take Denney's patrol unit to the Sheriff's Office, because he was then sent to a residence down the road to pick up Jennifer Nipp to help obtain a statement from John Nipp.  (See Exhibit 12, Affidavit of Larry Vaughn).

48.     While Denney was still standing on the scene, Denney also spoke on Stewart's cell phone with Burson; Denney testified that Burson told him (Denney) that Denney should write up a report in the morning, and send it over, to consider whether to obtain an arrest warrant.   Denney claims he does not know if  Burson had spoken with Sheriff Russell yet at this point.  (See Exhibit

---

[1] The AT&T records are provided in UTC (Coordinated Universal Time).  This Court should take judicial notice that as of January 20-21, 2014, Central Standard Time was six hours behind Coordinated Universal Time.   Thus, all time-stamps on the AT&T records must be moved back six hours ahead to convert them into Central Standard Time.  For example, a UTC time of 04:37:45 would actually have taken place at 10:37:45 p.m. Central Standard Time. (See also Exhibit 21, Navy UTC Conversion Chart; Exhibit 22, Explanation of when Central Standard Time would have converted into Daylight Savings time in 2014, not until March 9, 2014).

1, Deposition of Denney, 193:20-194:17, 196:22-197:2, 208:4-208:12).

49.     Stewart also spoke on the cell phone with Burson.  Burson told Stewart "Do not arrest that man [meaning John Nipp].  You cannot hold him in jail.  A report should be written up and sent to me, and if it is a legitimate case, a summons will be sent to John Nipp. " (See Exhibit 11, Affidavit of Harvey Stewart, Exhibit 4, Deposition of Russell, 168:17-168:22).

50.     Harvey Stewart then told Sheriff Russell that Burson had told him [Stewart] that John Nipp should not be arrested that night, but rather that Denney should write up a report and send it to the District Attorney. (See Exhibit 4, Deposition of Russell, 168:23-169:3)

51.     Sheriff Russell's decision not to arrest John Nipp that evening was based on his liability concerns over holding a blind man at the Love County Jail, and also that John Nipp was not a flight risk,  the severity of John Nipp's alleged crime, and the opinion of the District Attorney that a report should be written up instead of arresting him that evening.   The fact that John Nipp was Russell's uncle played no role in Russell's decision to not have John Nipp arrested that evening. (See Exhibit 4, Deposition of Russell, 165:25-166:8, 252:24-254:8).

52.     There is no law or policy of the State of Oklahoma requiring that John Nipp MUST have been arrested that evening; it was up to the Sheriff's discretion.  (See Exhibit 4, Deposition of Russell, 256:15-256:21).

53.     Denney claims that Undersheriff Stewart later told Denney that everything was said out of the heat of the moment, and that everything was fine.  However, Denney serves at the pleasure of the Sheriff, not the Undersheriff, and the Undersheriff does not have any authority to hire, fire, discipline, or rehire deputies. (See Exhibit 1, Deposition of Denney, 200:24-201:11; Exhibit 4, Deposition of Russell, 237:22-238:14, 260:12-260:15; Exhibit 11, Affidavit of Harvey Stewart).

54.     Denney does not know whether Undersheriff Stewart had actually talked to Sheriff

9

Russell about Denney's job status.  (See Exhibit 1, Deposition of Denney, 201:25-202:8, 202:14-202:18).

55.     In fact, Harvey Stewart had not approached Russell or said anything to Russell about Denney's job status.  Any conversation Stewart  had with Denney was not under Russell's orders (See Exhibit 4, Deposition of Russell, 182:23-184:6, 260:9-260:11; Exhibit 11, Affidavit of Harvey Stewart).

56.     Sheriff Russell never told Denney that he had not quit, never told Denney that he still had a job, and never told Denney that everything was ok. (See Exhibit 1, Depo. of Denney, 205:7-206:5).

57.     Sheriff Russell assumed that Denney was still on the scene because he was waiting for someone to give a ride home, or that one of the deputies would give him a ride home; at that point, Sheriff Russell determined he was no longer needed at the scene, and went straight to bed at home.  (See Exhibit 4, Deposition of Russell, 188:8-188:19, 270:1-270:4).

58.     Larry Vaughn took Jennifer Nipp back home, and returned with John Nipp's wife.  At that point, Vaughn noticed that Denney had already left the scene.  (See Exhibit 12, Affidavit of Larry Vaughn).

59.     Only the next day, January 21, 2014, Sheriff Russell learned that Denney had actually gotten in his unit later that night and went out on other calls.  Sheriff Russell had not known that Denney was doing this at the time that it occurred, and Denney had no right to go on those calls, as he had already quit.  (See Exhibit 4, Deposition of Russell, 188:20-188:23, 202:6-202:8, 278:4-278:20).

60.     On January 21, 2014, Sheriff Russell wrote up paperwork noting that Deputy Denney had quit the previous evening at approximately 12:30 a.m.  Russell also verbally reminded Denney

that he had quit the previous evening. (See Exhibit 1, Deposition of Denney, 213:11-214:8, 214:23-215:2, 225:12-225:15; Exhbit 13, January 21, 2014 Employment Action; Exhibit 4, Deposition of Russell, 205:2-205:9).

61.    Paragraph 17 of Plaintiff' Complaint, that "Sheriff Russell even threatened to terminate Plaintiff's employment should he refuse to release his uncle," is not true. Sheriff Russell never threatened to terminate Plaintiff. (See Exhibit 1, Deposition of Denney, 222:1-222:23).

62.    Denney has no evidence whatsoever that he was not an at-will employee, or that he was in any way entitled to a hearing before the conclusion of his employment with the Love County Sheriff's Office. Sheriff Russell never told Denney he was entitled to perpetual employment, or that he was entitled to a hearing, not did anyone ever tell Denney that he was entitled to a hearing. No Love County Sheriff's Office employee ever had such a hearing. Denney was also never given any consideration to create a contractual relationship with the Sheriff's Office, and had no such contract with the Sheriff's Office. (See Exhibit 1, Deposition of Denney, 225:21-230:4, 234:6-235:7; Exhibit 4, Deposition of Russell, 267:17-268:13).

63.    Plaintiff has no evidence whatsoever that the Board of County Commissioners was in charge of the Sheriff's Office's policies and procedures. (See Exhibit 1, Depo. of Denney, 233:16-234:5).

64.    Plaintiff cannot articulate any public policy in the State of Oklahoma that he claims was violated by Sheriff Russell. (See Exhibit 1, Deposition of Denney, 235:8-236:22).

65.    Denney claims that Brian Walker at the Garvin County Sheriff's Office told Denney that Sheriff Russell had told Garvin County Undersheriff Jim Mullett that Denney was a real "piece of shit." (See Exhibit 1, Deposition of Denney, 237:8-238:24).

66.    The alleged statement above in paragraph 65 is the only alleged statement Plaintiff

11

is referring to in his defamation claim.  (See Exhibit 1, Deposition of Denney, 239:23-240:20).

67.     Russell did not tell Garvin County Undersheriff Mullett that Denney was a "piece of shit."  (See Exhibit 4, Deposition of Russell, 272:12-272:17).

68.     No law enforcement agency anywhere in Oklahoma ever contacted Sheriff Russell to ask for a reference, or for his opinion, regarding hiring Denney, nor has Sheriff Russell ever told any Sheriff not to hire Johnny Denney  (See Exhibit 4, Depo. of Russell, 219:21-219:25, 275:20-275:23).

69.     Denney does not know why he did not get a job at the Garvin County Sheriff's Office, and in fact has never spoken directly to the Garvin County Sheriff.  (See Exhibit 1, Deposition of Denney, 239:14-239:25, 240:21-240:25).

70.     Denney did not even start looking to work in law enforcement again until August 2014.  Denney has continued working in law enforcement in the time since, working at the City of Wynnewood Police Department beginning in February 2015, and then the Carter County Sheriff's Office beginning in August 2015.  (See Exhibit 1, Deposition of Denney, 245:5-248:20, 249:9-250:6).

71.     Plaintiff's Notice of Tort Claim was filed July 30, 2014.  (See Exhibit 1, Deposition of Denney, 257:24-258:16; Exhibit 14, Tort Claim).

72.     Denney is not aware of anyone at the Love County Sheriff's Office ever being terminated for arresting someone.  (See Exhibit 1, Deposition of Denney, 308:12-308:14).

73.     The Love County Sheriff has a statutory duty to run the Love County Jail, and approves the Policies and Procedures regarding the operation of the Love County Jail.  (See Exhibit 4, Deposition of Russell, 238:22-240:6).

74.     Only the Sheriff, not the Board of County Commissioners, has the authority to hire,

discipline, terminate, or reprimand deputies, and to approve the policies and procedures of the Sheriff's Office.  (See Exhibit 4, Deposition of Russell, 240:7-241:13).

## ARGUMENT AND AUTHORITY

### I.  STANDARD OF REVIEW

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.*  In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.*

### II.  DEFENDANT BOARD IS NOT A PROPER PARTY TO PLAINTIFF'S FEDERAL CAUSE OF ACTION FOR A DUE PROCESS VIOLATIONS

In Plaintiff's First Amended Complaint, Plaintiff first brings a cause of action against Defendant Board pursuant to 42 U.S.C. § 1983, claiming violations of his right to due process.  First and foremost, Defendant Board is not a proper party to said claims.

For the purposes of attempting to establish municipal liability under § 1983, the proper defendant is Love County Sheriff Joe Russell in his official capacity, who Plaintiff failed to name as a Defendant.  Pursuant to Okla. Stat. tit. 19, § 547, the Sheriff is responsible for the official acts of his undersheriff and deputy sheriffs. Moreover, under Okla. Stat. tit 19, § 513, the Sheriff has charge and custody of the jail of his county.  Conversely, the general powers of the Board are set forth in Okla. Stat. tit. 19, §339.  The limits of these powers are strictly construed. *Allen v. Board of Com'rs of Pittsburg County*, 116 P. 175 (Okla. 1911).  The Board may not exercise any authority unless expressly granted in the statutes or arising by implication from the statutory powers.

13

*Lairmore v. Board of Com'rs, Okmulgee County*, 195 P.2d 762, 764 (Okla. 1948) (citation omitted);

*State ex rel. Tharel v. Board of Com's of Creek County*, 107 P.2d 542, 549 (Okla. 1940) (citation

omitted). The authority to keep the county jail or to supervise or train Sheriff's deputies are not

among the enumerated powers of the Board set forth in §339.

The Tenth Circuit Court of Appeals has confronted a related issue in *Meade v. Grubbs*, 841

F.2d 1512 (10th Cir. 1988), which involved actions by Sheriff's Deputies. In *Meade*, the Tenth

Circuit confirmed that a board of county commissioners cannot be held liable under § 1983 for

actions within the Sheriff's office. The Court relied on Okla. Stat. tit. 19, §§ 513 and 547(A) for the

proposition that "[u]nder Oklahoma law, a sheriff is responsible for the proper management of the

jail in his county and the conduct of his deputies." *Id*. at 1528. In holding that the board of county

commissioners could not be held liable under § 1983, the Court stated that "[u]nder Oklahoma law,

the Board has no statutory duty to hire, train, supervise, or discipline the county sheriffs or their

deputies." *Id*. The Court further held that "[c]onsequently, unless the Commissioners voluntarily

undertook responsibility for hiring or supervising county law enforcement officers, which is not

alleged, they were not 'affirmatively linked' with the alleged acts." *Id*.

Likewise, in *Jantzen v. Bd. of County Comm'rs of Canadian County*, 188 F.3d 1247, 1259

(10th Cir. 1999), the Tenth Circuit specifically held that the defendant board of county

commissioners may not be held liable for violating §1983 due to the actions of a municipal official

in his official capacity absent a showing that said official was executing an unconstitutional policy

or custom of the board itself. In so holding, the court in *Jantzen* rejected the appellants' argument

that the sheriff in his official capacity is essentially the same entity as the board with regard to

liability under §1983.

Appellants, citing *Brandon v. Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873, 83 L.Ed.2d

14

> 878 (1985), argue that the Board should be held liable because [Sheriff] Hawkins in his official capacity "is essentially the same entity as the Board." **However, a municipality cannot be liable under § 1983 for acts of a municipal official in his official capacity "unless that official possesses final policymaking authority to establish municipal policy with respect to acts in question**." *Houston v. Reich*, 932 F.2d 883, 887 (10th Cir.1991) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

*Id.* (emphasis added).  The court further reasoned that "[t]he Sheriff was popularly elected by the people of Canadian County, and he fired the Appellants. The Sheriff neither reports to, nor is controlled by, the Board, and thus there is no basis in this case by which the Board could be held liable for such allegedly unlawful terminations." *Id*.

A board of county commissioners' limited authority set forth by statute cannot be said to affirmatively link the board to actions taken by a county sheriff or his personnel for the purposes of imposing municipal liability under  § 1983.  As set forth in the Oklahoma statutory scheme for county government, the office of sheriff and the office of county commissioner are autonomous positions with separate, and specifically delineated spheres of authority. Pursuant to *Meade*, *supra*, a board of county commissioners cannot be held liable under federal law for the acts of the sheriff's personnel or the policy and custom of the sheriff's office and jail.  Pursuant to *Jantzen*, *supra*, a county sheriff is not essentially the same entity as a board of commissioners with regard to liability under federal law, and a board may not be held liable thereunder for the actions of a municipal official in his official capacity absent a showing that said official was executing an unconstitutional policy or custom of the board itself.

Numerous District Court opinions have found that a Board of County Commissioners cannot be held responsible for actions within a Sheriff's Office, including for claims of liability under 42 U.S.C. § 1983, and for employment discrimination under the employment statutes.  *See Lacher v. Bd. of Cnty. Comm'rs for Okla Cnty ex rel. Okla. Cnty. Clerk's Office*, 2013 WL 268983 at *4(W.D.

Okla., Jan. 24, 2013)(unpublished case, attached as Exhibit 15)(a terminated employee of the County

Clerk's office sued the Board of County Commissioners of Oklahoma County for discrimination

under the ADA, the ADEA, and the OADA. The Court held that "because [the Board] is a

constitutionally created body without any supervisory control over plaintiff or the County Clerk's

office, [the Board] is not plaintiff's employer and therefore can not [sic] be held liable under

ADEA").

        Judge Eagan in the Northern District also recently wrote:

> As this Court has previously written, a Board of County Commissioners "is statutorily separate and distinct from the independently elected sheriff." *Beers v. Ballard,* 04–CV–0860–CVE–SAJ, 2005 WL 3578131 at *6 (N.D. Okla. Dec. 29, 2005). The powers of the two entities, as well as their respective spheres of influence, may be related, but they are not redundant. *Compare* OKLA STAT. Tit. 19, §§ 3, 339 *with Okla. Stat. Tit. 19, § 547.* The Tenth Circuit, interpreting Oklahoma law, agrees: "[T]he Board [of County Commissioners] has no statutory duty to hire, train, supervise or discipline the county sheriffs or their deputies." *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988). There are occasions when a suit against a Board of County Commissioners regarding the actions of a sheriff's deputies could be correct. *See Meade,* 341 F.2d at 1528 (noting that such a suit would be possible if "the Commissioners voluntarily undertook responsibility for hiring or supervising county law enforcement officers"); *see also Jantzen v. Hawkins, 188 F.3d 1247, 1259 (10th cir. 1999)* (finding no reason to hold a Board of County Commissioners responsible where the sheriff was not reporting to, controlled by, or executing an official policy of the Board). Yet even when the evidence is viewed in the light most favorable to plaintiffs, summary judgment for the Board is required here. The second amended complaint is completely devoid of any reference to the Board itself, its individual members, or its employees. Plaintiffs present no policies, customs, or other legal justifications, outside of their reference to Title 19, §4, showing why the Board is responsible for the allegedly unconstitutional acts of Sheriff Davis, his deputies, or the jail officials in his employ. Thus, the Board is entitled to summary judgment on all of plaintiffs' claims under §1983.

*Goss v. Bd. of Cnty. Comm'rs of Creek Cnty.*, 2014 WL 4983856, at *6 (N.D. Okla. Oct. 6,

2014)(unpublished case, attached as Exhibit 16).

        Here, there is no allegation or evidence that the Board itself was involved in the alleged

employment decisions regarding the Plaintiff or the alleged wrongful treatment of Plaintiff or that

the Sheriff delegated any policy-making authority to the Board with regard to the actions of the Love County Sheriff's Office; nor is there any allegation or evidence which otherwise affirmatively link the Board to Plaintiff's allegations herein.  Consequently, the Board is not a proper party defendant to Plaintiff's Title VII, § 1981, or § 1983 claims of federal due process violations.

In fact, Plaintiff has no evidence whatsoever that the Board of County Commissioners was in charge of the Sheriff's Office's policies and procedures.  (See Undisputed Fact No. 63).  Only the Sheriff, not the Board of County Commissioners, has the authority to hire, discipline, terminate, or reprimand deputies, and to approve the policies and procedures of the Sheriff's Office.  (See Undisputed Fact No. 74).

Like in *Goss, supra*, and *Lacher, supra*, Plaintiff has presented no evidence why the Board itself should be responsible for the allegedly illegal or unconstitutional acts of Sheriff Russell.  Thus, Defendant Board is clearly entitled to summary judgment on Plaintiff's First Claim for Relief for federal due process violations.

### III.  DUE PROCESS VIOLATIONS

Even assuming arguendo that the Board is a proper party to Plaintiff's due process claims (which is denied), Defendant Board is still entitled to summary judgment on said claims.  Plaintiff claims that Defendant has violated both his procedural and substantive due process rights because his alleged termination violated a property interest protected by the due process clause, claiming that he was entitled to notice and an opportunity to be heard.  First and foremost, it does not appear that Plaintiff actually has a claim related to a substantive due process violation. "Substantive due process arises from the Fourteenth Amendment's protections against governmental deprivations without due process of law.  Under this framework, due process protections are accorded primarily to matters relating to marriage, family, procreation, and the right to bodily integrity. And, moreover, in

17

extending these concepts to further bar certain government actions regardless of the fairness of the procedures used to implement them, the Supreme Court has emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008)(internal quotations omitted). Plaintiff is not claiming any due process violation related to marriage, family, procreation or the right to bodily integrity. Rather, Plaintiff's claim that he was entitled to notice and an opportunity to be heard is simply a claim of a procedural due process violation, not a substantive due process violation. To the extent that Plaintiff is attempting to bring a substantive due process claim, there is simply no basis in law for any such claim at all, and Defendant Board is entitled to summary judgment.

As for procedural due process, "To determine whether a plaintiff was denied procedural due process, [a court] engage[s] in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection was available? (2) Was the individual afforded an appropriate level of process?" *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)(citation omitted). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Darr v. Town of Telluride, Colo*, 495 F.3d 1243, 1251 (10th Cir. 2007). "To create a property interest, the state-law rule or understanding must give the recipient 'a legitimate claim of entitlement to [the benefit].' For example, an employee may possess a property interest in public employment if she has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent." *Id*. (Internal quotations omitted). At-will employees lack a property interest in continued employment. *Id* at 1252. Under Oklahoma law, it is clear that public employees are at-will unless they have specific contractual arrangements entitling them to continued employment, such as tenure agreements. *Bunger v. University of Oklahoma Board of Regents*, 95

18

F.3d 987, 990 (10ᵗʰ Cir. 1996).  It is additionally clear that "a property interest is defined by substantive, rather than procedural restrictions on an employer's discretion to terminate and employee," and that procedures themselves do not create any property interest.  *Rusillo v. Scarborough*, 935 F.2d 1167, 1170 (10ᵗʰ Cir. 1991); *see also Curtis Ambulance v. Shawnee City Board of County Commissioners*, 811 F.2d 1371, 1377 (10ᵗʰ Cir. 1987)(stating "no property interest exists in a procedure itself, without more").

Since state law in Oklahoma does not allow only for at-cause termination, and as Plaintiff undisputedly is not tenured, the only means by which Plaintiff could potentially have a property right protected by procedural due process would be if Plaintiff had an express or implied contract for continued employment.  To form a contract in the first place, it is essential that there be  1. Parties capable of contracting; 2. Their consent; 3. A lawful object; and 4. Sufficient cause or consideration. Title 15, Okla. Stat. §2.  The consent of the parties to a contract must be free, mutual, and communicated by each to the other.  Title 15, Okla. Stat. § 51.

Here, it is beyond legitimate dispute that Plaintiff was an at-will employee, with no  express or implied promise of continued employment. Again, on August 31, 2012, Denney signed an employee personnel policy handbook acknowledgment form. The form stated: "I further understand this handbook is not nor is it intended to be a contract of employment.  I further understand the county elected officer retains the right of employment-at-will to terminate his or her employees at any time for any reason not prohibited by federal, state or municipal law, and also employees can terminate at will."  Denney understood that he was an employee-at-will.  (See Undisputed Fact No. 3).  Denney agrees that the policy at the Love County Sheriff's Office at all relevant times was that "Love County offers no employment contracts nor does it guarantee any minimum length of employment.  Just as any employee my terminate employment at any time, so may Love County

19

terminate an employee at any time 'at-will,' with or without cause, with or without notice. (See Undisputed Fact No. 4). Plaintiff has no evidence whatsoever that he was not an at-will employee, or that he was in any way entitled to a hearing before the conclusion of his employment with the Love County Sheriff's Office. Sheriff Russell never told Denney he was entitled to perpetual employment, or that he was entitled to a hearing, not did anyone ever tell him he was entitled to a hearing. No Love County Sheriff's Office employee ever had such a hearing. Plaintiff was also never given any consideration to create a contractual relationship with the Sheriff's Office, and had no such contract with the Sheriff's Office. (See Undisputed Fact No. 62). Plaintiff simply has no cognizable basis whatsoever for any claim that he was anything but an at-will employee.[2]

Finally, even if Plaintiff was entitled to notice and an opportunity to be heard (which is certainly denied). he was not terminated, but rather quit his employment, as will be discussed in more detail in Section IV below. Thus, Plaintiff certainly cannot show that he was denied an appropriate level of process, EVEN if he was entitled to it.

## IV.  BURK TORT.

Plaintiff also brings a "*Burk* Tort" claim, alleging that he was terminated in violation of an allegedly clear and compelling public policy forbidding the interference with and retaliation against Oklahoma peace officers in the connection of their public duties.

In order to establish a so-called *Burk* tort, Plaintiff must prove "(1) actual or constructive

---

[2]Plaintiff may attempt to claim that a statement in the "Handbook for County Sheriffs 2015" that the removal of a County Sheriff or any other county official requires a civil and/or legal process provides a basis for an implied contract. However, this Handbook was from 2015, the year after the end of Plaintiff's employment, and Sheriff Russell has never even read it. (See Exhibit 4, Deposition of Russell, 267:10-267:16). Moreover, the Handbook cites Title 22, Okla. Stat. § 1181-1196, which refer to the procedure for impeaching elected officials, not at-will employees like Plaintiff. Any such handbook is completely irrelevant to the facts of this case.

20

discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal. *Kruchowski v. Weyerhaeuser Co.*, 2008 OK 105, 202 P.3d 144, 151-52 (citing *Vasek v. Board of County Commissioners*, 2008 OK 35, ¶¶27-28, 186 P.3d 928, 932).

Plaintiff will, at the very least, be unable to establish several of the elements of a *Burk* tort claim. First and foremost, Plaintiff will be unable to establish actual or constructive discharge. Rather, Plaintiff quit his employment with the Love County Sheriff's Office. Again, Denney testified that when he could not immediately arrest John Nipp, he very loudly and argumentatively yelled at Sheriff Russell "If you're not going to let us do our fucking jobs, we should all fucking quit" and tossed his key fob to his Sheriff's Office patrol vehicle on the hood. (See Undisputed Fact No. 38). Denney does not, however, recall the exact words that were exchanged between him and Sheriff Russell. (See Undisputed Fact No. 39). Sheriff Russell testified that Denney rudely and loudly said: "Fuck it, I quit" or "Well, fuck it, then, I quit" and threw his key fob on the hood of the vehicle, and walked off. (Undisputed Fact No. 40). Denney does not know whether Sheriff Russell perceived that he (Denney) had just quit his job. Based on Denney's words, tone, and actions with the key fob, however, Russell in fact did perceive that Denney had just quit his job. (See Undisputed Fact No. 41). Deputy Cody Blagg and Undersheriff Harvey Stewart both testified that they also viewed this incident, and also perceived that Denney had quit his job as a Love County Deputy. (See Undisputed Fact No. 42). Sheriff Russell simply did not terminate Denney. (See Undisputed Fact No. 43). In fact, Reserve Deputy Larry Vaughn testified that he overheard Denney on the cell phone with someone, saying "that he [Denney] needed a ride because he had just quit his job." (See

21

Undisputed Fact No. 44).  Sheriff Russell then told Reserve Deputies Larry Vaughn and Brett Harris that one of them needed to drive Denney's patrol car back to the Sheriff's Office, as Denney had just quit.  (See Undisputed Fact No. 46).  On January 21, 2014, Sheriff Russell wrote up paperwork noting that Deputy Denney had quit the previous evening at approximately 12:30 a.m."  Russell also verbally reminded Denney that he had quit the previous evening.  (See Undisputed Fact No. 60).  Even if Plaintiff apparently later changed his mind after loudly and argumentatively quitting his job, it was too late; he had already quit his job, and was no longer employed as a Love County Sheriff's Deputy.  Plaintiff simply cannot establish "actual or constructive discharge."

Moreover, Plaintiff also cannot establish the third and fourth elements of a *Burk* tort claim.  Again, to succeed on a *Burk* claim, there must be an identifiable Oklahoma public policy goal "that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma."  *Moore v. Oklahoma State University*, 255 P.3d 442, 446, 2011 OK CIV APP 49, ¶ 17 (Okla.Civ.App. Div. 2,2010).  It is Plaintiff's burden to articulate what said Oklahoma Public policy goal is.  *See  Brewer v. Baptist's Inc*., 2012 WL 5499633, at *8 (W.D.Okla.,2012)(internal quotations omitted)(unpublished case, attached as Exhibit 17)("Here, Plaintiff has failed to articulate a constitutional, statutory, or decisional law basis for the Oklahoma public policy prohibiting her constructive discharge. An employer's violation of a state-declared public policy is the fundamental predicate for a *Burk* tort, whether Plaintiff's claim implicates a sufficiently discernable public policy presents a question of law to be resolved by ... the trial court..... As such, the Court finds Plaintiff's failure to identify a sufficiently discernable public policy fatal to her *Burk* tort claim").

Here, while Plaintiff has generally alleged in his Amended Complaint that there is allegedly some policy forbidding the interference with and retaliation against Oklahoma peace officers in the

22

connection of their public duties, Plaintiff fails to articulate any constitutional, statutory, or decisional basis for any Oklahoma public policy allegedly prohibiting his discharge (and again, he was not discharged).  (See Undisputed Fact No. 64).  It is his burden to do so.

To the extent that Plaintiff may generally argue that the Sheriff violated some public policy of the State of Oklahoma by not allowing Plaintiff to arrest John Nipp on the evening of January 20, 2014, Plaintiff, presents no constitutional, statutory, or decisional basis for any such public policy. In fact, there is no law or policy of the State of Oklahoma requiring that John Nipp MUST have been arrested that evening; it was up to the Sheriff's discretion.  (See Undisputed Fact No. 52). Moreover, the District Attorney told the Sheriff, the Undersheriff, and Plaintiff himself that the course of action should be simply to submit a report, with the District Attorney deciding later whether to press charges.  (See Undisputed Fact No. 45, 48, 49).[3]  Even if such a public policy existed, moreover, it would not bar Plaintiff's alleged discharge. As Plaintiff cannot articulate any particular Oklahoma public policy goal, Plaintiff also cannot establish the Fifth element of a *Burk* tort, namely that "no statutory remedy exists that is adequate to protect that Oklahoma policy goal."  For all the reasons discussed above, Plaintiff is unable to establish the elements of a *Burk* tort, and any such claim alleged against Defendant Board must be dismissed as a matter of law.

## V.  OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT

Moreover, The Oklahoma Governmental Tort Claims Act ("OGTCA") is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity in tort. *Fuller v. Odom*, 1987 OK 64, ¶¶ 3-4, 741 P.2d 449; *see also* Okla. Stat. tit. 51, § 153(B).  In the

---

[3]Defendant notes that as one of the elements of a *Bur*k tort is "at-will employment," Plaintiff's claim that he is entitled to recover under a *Burk* tort theory also negates his earlier contention that he is entitled to recover for a procedural due process claim.

23

OGTCA, Okla. Stat. tit. 51, § 152.1(A), the legislature adopted and reaffirmed sovereign immunity for the State, its political subdivisions, and all employees acting within the scope of their employment. This immunity is subject to a limited waiver to the extent and the manner specifically provided for by the provisions of the other sections of the Act. Okla. Stat. tit 51, § 152.1(B). In order to recover under the OGTCA, a person must comply with the presentation of a claim within one year of the date of the alleged loss or such claims will be barred forever. Okla. Stat. Tit. 51, § 156(B). Once notice is timely presented, the Act provides the governmental entity with a 90-day period to consider the claim. Okla. Stat. Tit. 51, § 157(A). If the governmental entity approves or denies the claim within 90 days, it must give notice within 5 days of such action to the claimant at the address listed in the claim, and the Plaintiff then has 180 days to commence suit. Okla. Stat. Tit. 51, § 157(A), (B). If the governmental entity fails to provide notice to the Plaintiff of its approval or denial, or if the governmental entity fails to respond to the claim at all, there is a 90-day waiting period running from the date of the original Notice of Tort Claim before the 180 days begin to run. Okla. Stat. Tit. 51, § 157(A), (B). The Oklahoma Supreme Court has stated that "(1) compliance with the written notice of claim and denial of claim provisions in §§ 156 and 157 are prerequisites to the state's consent to be sued and to the exercise of judicial power to remedy the alleged tortious wrong by the government; (2) judicial power is invoked by the timely filing of the governmental tort claims action pursuant to §157; and (3) expiration of the 180-day time period in §157(B) operates to bar judicial enforcement of the claim against the government to which the legislature waived sovereign immunity. *Shanbour v. Hollingsworth*, 918 P.2d 73, 75 (citing *Cruse v. Bd. of Cnty Comm'rs of Atoka Cnty.*, 910 P.2d 998, 1004-05 (Okla. 1995)); *see also Crockett v. Central Okla. Transp. & Parking Auth.*, 231 P.3d 748, 752 (Okla. Civ. App. 2010). Here, Plaintiff filed his Notice of Tort Claim on July 30, 2014. (See Undisputed Fact No. 71). This would have been deemed

denied 90 days later, or by October 28, 2014.   Thus, under Okla. Stat. tit. 51, § 157(B), Plaintiff was

required to file suit within 180 days of October 28, 2014.  180 days from October 28, 2014 is

Sunday, April 26, 2015. However, Plaintiff filed his Complaint on Tuesday, April 28, 2015.  (See

Dkt. 3). Since failure to meet the 180-day time limit operates to bar judicial enforcement of a claim

against the government, and Plaintiff failed to file his Complaint within that time frame, Plaintiff

thus did not follow the  written notice of claim provision of the OGTCA, and Plaintiff's *Burk* tort

claim must be dismissed for this additional reason.

## VI.  CONCLUSION

For all the reasons discussed above, all claims against Defendant Board must be dismissed

as a matter of law.

Respectfully submitted,

/s/ Jordan L. Miller
Jordan L. Miller, OBA No. 30892
Chris J. Collins, OBA No. 1800
COLLINS, ZORN & WAGNER, P.C.
429 NE 50th, Second Floor
Oklahoma City, Oklahoma 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: Jordan@czwglaw.com
       cjc@czwglaw.com

ATTORNEYS FOR DEFENDANTS
BOARD OF COUNTY COMMISSIONERS
OF LOVE COUNTY, OKLAHOMA AND
JOE RUSSELL, IN HIS INDIVIDUAL
CAPACITY

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on April 1, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

          Dane J. Flesch
          Tony Gould
          George H. Brown
          Robert W. Henderson
          Brown & Gould, PLLC
          136 N.W. 10th Street, Suite 200
          Oklahoma City, OK  73103

                        /s/ Jordan L. Miller
                        Jordan L. Miller