IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

JOHNNY DENNEY,                          )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Case No. CIV-15-158-JHP
                                        )
BOARD OF COUNTY                         )
COMMISSIONERS OF LOVE                   )
COUNTY, OKLAHOMA, and JOE               )
RUSSELL, in his individual capacity,    )
                                        )
                    Defendants.         )

---

**DEFENDANT JOE RUSSELL, IN HIS INDIVIDUAL
CAPACITY'S  MOTION FOR SUMMARY JUDGMENT**

---

Jordan L. Miller, OBA No. 30892
Chris J. Collins, OBA No. 1800
COLLINS, ZORN & WAGNER, P.C.
429 NE 50th, Second Floor
Oklahoma City, Oklahoma 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: Jordan@czwglaw.com
        cjc@czwglaw.com

Attorneys for Defendant

April 1, 2016

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

LIST OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

LCvR 56.1(b) STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT AND AUTHORITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     I.      STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     II.     DEFENDANT RUSSELL, IN HIS
              INDIVIDUAL CAPACITY, IS NOT
              LIABLE FOR DEFAMATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     III.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITY

**CASES**                                                                  **PAGE**

*Adler v. Wal-Mart Stores, Inc.,* 144 F. 3d 664 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Cone v. Longmont United Hosp. Ass'n,* 14 F. 3d 526 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . 13

*Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, 958 P.2d 128, 145 n.62. . . . . . . . . . . . 16

*Hall v. Bellmon,* 935 F.2d 1106 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Johnson v. Weld County, Colorado,* 594 F.3d 1202 (10th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . 15

*Pellegrino v. State ex rel. Cameron University,* 2003 OK 2, ¶¶ 5-6, 63 P.3d 535. . . . . . . . . . . 17

*Speight v. Presley,* 2008 OK 99, ¶ 20, 203 P.3d 173. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sturgeon v. Retherford Publications, Inc.,* 1999 OK CIV APP 78, ¶ 10,
     987 P.2d 1218. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tanique, Inc. v. State ex rel. Oklahoma Bureau of Narcotics and Dangerous Drugs,*
     99 P.3d 1209, 2004 OK CIV APP 73, ¶ 29 (Okla. Civ.App. Div. 2,2004). . . . . . . . . . . 14

**RULES**

Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATUES**

Okla. Stat. tit. 51, § 152(7).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## LIST OF EXHIBITS

Exhibit 1:      Excerpts from the Deposition of Plaintiff Denney

Exhibit 2:      Employment Application

Exhibit 3:      Employee Personnel Record

Exhibit 4:      Excerpts from the Deposition of Sheriff Russell

Exhibit 5:      Employee Personnel Policy Handbook Acknowledgment Form

Exhibit 6:      2010 Employee Personnel Policy Handbook

Exhibit 7:      2013 Employee Personnel Policy Handbook

Exhibit 8:      Statement of Sheriff Russell

Exhibit 9:      Statement of John Nipp

Exhibit 10:     Affidavit of Cody Blagg

Exhibit 11:     Affidavit of Harvey Stewart

Exhibit 12:     Affidavit of Larry Vaughn

Exhibit 13:     January 21, 2014 Employment Action

Exhibit 14:     Tort Claim

Exhibit 15:     AT&T Records from Denney's cell phone number

Exhibit 16:     CLEET Notice of Change of Address

Exhibit 17:     Driver Employment Application

Exhibit 18:     Navy UTC Conversion Chart

Exhibit 19:     Explanation of when Central Standard Time would have converted into Daylight
                Savings time in 2014, not until March 9, 2014

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

JOHNNY DENNEY,                          )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )        Case No. CIV-15-158-JHP
                                        )
BOARD OF COUNTY                         )
COMMISSIONERS OF LOVE                   )
COUNTY, OKLAHOMA, and JOE               )
RUSSELL, in his individual capacity,    )
                                        )
                    Defendants.         )

**DEFENDANT JOE RUSSELL, IN HIS INDIVIDUAL CAPACITY'S MOTION FOR
SUMMARY JUDGMENT**

Defendant Joe Russell, in his individual capacity, ("Russell") respectfully requests that this

Court grant summary judgment in his favor as to all claims alleged against him pursuant to Fed. R.

Civ. P. 56, as set forth in the following Brief.

**LCvR 56.1(b) STATEMENT**

Pursuant to LCvR 56.1(b), Defendant Russell  asserts that there is no genuine dispute as to

the following material facts:

1.      On October 24, 2012, Plaintiff Johnny Denney ("Denney" or "Plaintiff") submitted

an employment application to the Love County Sheriff's Office.  Even in his application, Denney

signed that he understood and agreed that his employment could be terminated at any time for any

reason not prohibited by law. (See Exhibit 1, Deposition of Denney, 54:13-55:20; Exhibit 2,

Employment Application).

2.      Denney was hired by Love County Sheriff Joe Russell ("Russell") as a Deputy Sheriff

on approximately August 28, 2012.  (See Exhibit 1, Deposition of Denney, 63:10-64:9; Exhibit 3,

Employee Personnel Record; Exhibit 4, Deposition of Sheriff Russell, 111:1-111:19).

3.      On August 31, 2012, Denney signed an employee personnel policy handbook acknowledgment form.  The form stated: "I further understand this handbook is not nor is it intended to be a contract of employment.  I further understand the county elected officer retains the right of employment-at-will to terminate his or her employees at any time for any reason not prohibited by federal, state or municipal law, and also employees can terminate at will."  Denney understood that he was an employee-at-will.  (See Exhibit 1, Deposition of Denney, 65:21-66:24; Exhibit 5, Employee Personnel Policy Handbook Acknowledgment form).

4.      Denney agrees that the policy at the Love County Sheriff's Office at all relevant times was that "Love County offers no employment contracts nor does it guarantee any minimum length of employment.  Just as any employee may terminate employment at any time, so may Love County terminate an employee at any time 'at-will,' with or without cause, with or without notice."  (See Exhibit 1, Deposition of Denney, 68:8-70:9; Exhibit 6, 2010 Employee Personnel Policy Handbook, Exhibit 7, 2013 Employee Personnel Policy Handbook).

5.      Denney was approved to be a canine officer in July of 2013, working with a German Shepherd named Coach.  (See Exhibit 1, Deposition of Denney, 88:19-89:5; Exhibit 4, Deposition of Russell, 119:2-119:19).

6.      Prior to January 20, 2014, Sheriff Russell never told Denney that he could not arrest anybody.  (See Exhibit 1, Deposition of Denney, 96:18-96:23).

7.      Prior to January 20, 2014, Denney never made any complaints to anyone about the way the Love County Sheriff's Office was run.  (See Exhibit 1, Deposition of Denney, 79:14-79:18).

8.      On January 20, 2014, at about 10:40 p.m. Denney was called by dispatch, saying that the Oklahoma Highway Patrol needed his assistance with his canine in a pursuit on Oswalt Road. (See Exhibit 1, Deposition of Denney, 104:6-105:12, 109:13-109:15).

2

9.      Denney left his house after receiving this call, wearing a T-shirt and Nike Wind pants. He was not wearing a uniform of any type, and did not have his badge.  (See Exhibit 1, Deposition of Denney, 109:21-110:18).

10.      As Denney was headed toward the area of Oswalt Road, he heard on the radio that the driver of the vehicle had been identified as James Con Nipp ("Con Nipp").  (See Exhibit 1, Deposition of Denney, 114:23-116:19).

11.      Oklahoma Highway Patrol Trooper Brian Quinn ("Quinn") told Denney over the radio that  Denney and his canine were needed at the Nipp residence on Long Hollow Road.  (See Exhibit 1, Deposition of Denney, 119:2-119:23).

12.      Denney drove to the Nipp residence, exited his patrol car with his canine, and walked toward the Nipp residence.  As Denney approached the residence, he got into a verbal altercation with  Con Nipp and Con Nipp's dogs.  Con Nipp was cursing and being belligerent, and then turned around to go back inside the residence. (See Exhibit 1, Deposition of Denney, 121:20-123:5, 125:4-128:15, 130:2-131:2).

13.      Denney followed Con Nipp into the residence, where the lights were on and Denney saw several subjects in the house.  Denney detained and handcuffed Con Nipp, taking him back out to Denney's patrol vehicle.   (See Exhibit 1, Deposition of Denney, 131:17-137:19).

14.      Denney walked back to the residence to enter the house a second time.  Denney testified that as he attempted to open the door, that the door was slammed back into him  on  his wrist, and that somebody then tried to hold the door closed to keep him out of the residence.  (See Exhibit 1, Deposition of Denney, 139:11-141:20).

15.      As he entered the house, Denney did not knock on the door or announce who he was. (See Exhibit 1, Deposition of Denney, 154:11-154:25).

3

16.     Denney testified that he forced the door open, and was struck in the side of the head, knocking Denney's glasses off. (See Exhibit 1, Deposition of Denney, 143:24-145:15).

17.     Denney claims he could not immediately tell who had punched him in the face, just that it was a "person that was standing in front of me." (See Ex. 1, Depo of Denney, 145:16-145:24).

18.     Denney claims that he then "engaged the subject" by hitting the individual with both closed fists at least two or three times, knocking the individual over a couch onto the floor.  (See Exhibit 1, Deposition of Denney, 150:2-151:14, 152:16-153:10).

19.     Denney's eyes were open for at least part of this period, (See Exhibit 1, Deposition of Denney, 157:5-157:19).

20.     Denney testified that Trooper Quinn grabbed the individual's hands and told him to stop hitting, at which point Denney put his glasses back on.  Denney claims he did not realize who had been hitting until this point; the individual turned out to be John Nipp (Con Nipp's grandfather), an elderly blind resident of the house who does not have any eyes.  (See Exhibit 1, Deposition of Denney, 153:14-154:1, 155:1-156:23).

21.     Denney did not handcuff John Nipp at this point, but rather went outside of the residence and contacted Sheriff Joe Russell and Undersheriff Harvey Stewart ("Stewart") to come to the scene.  (See Exhibit 1, Deposition of Denney, 162:24-163:14, 164:23-165:13).

22.     Denney informed Sheriff Russell that there had been an altercation and fist fight between Denney and John Nipp when John Nipp tried to slam the door in Denney's face.  Sheriff Russell's testimony was that Denney said "Me and John Nipp just had a fucking fist fight," and that when Denney was reminded that John Nipp was blind, Denney responded "I don't give a fuck because he shut the door in my face." (See Exhibit 1, Deposition of Denney, 171:23-172:24; Exhibit 4, Deposition of Russell, 157:18-158:9; Exhibit 8, Statement of Sheriff Russell).

4

23.     John Nipp is Sheriff Russell's uncle; Con Nipp is Sheriff Russell's second cousin. (See Exhibit 1, Deposition of Denney, 178:21-178:24; Exhibit 4, Depo. of Russell, 112:1-112:17).

24.     After speaking with Denney, Sheriff Russell went to speak with John Nipp.  John Nipp told Russell that Trooper Quinn had told him [John Nipp] that they had chased a blue pickup truck to the house.   John Nipp further told Russell that he [John Nipp] believed the driver of the pickup could have been a murderer or anyone, that he [John Nipp] had gone to lock the front door when the door was pushed in and John Nipp fell back against the wall, and that Denney had hit John Nipp, before John Nipp swung back. (See Exhibit 4, Depo. of Russell, 158:12-159:16, 173:11-173:13; Exhibit 9, Statement of John Nipp).

25.     Sheriff Russell testified that he had spoken with both law enforcement officials (Love County Deputy Cody Blagg and Trooper Brian Quinn) who had been in the proximity of the altercation between Denney and John Nipp, and that both Blagg and Quinn told Russell that they did not know who had hit who first.  (See Exhibit 4, Deposition of Russell, 164:7-165:11)

26.     Sheriff Russell came outside and spoke with Denney again.  Denney very loudly told Sheriff Russell he wanted to arrest John Nipp for assaulting a police office (namely Denney himself). (See Exhibit 1, Deposition of Denney, 173:19-174:6; 174:21-175:8).

27.     Denney was in a state that Russell had "never seen in him before."  (See Exhibit 4, Deposition of Russell, 171:15-171:22).

28.     Denney agrees that Sheriff Russell had no problem with the arrest that evening of Con Nipp, who is not blind and has eyes, and who is also related to Sheriff Russell.  (See Exhibit 1, Deposition of Denney, 178:25-179:11).

29.     Con Nipp has been arrested several times by the Love County Sheriff's Office,  as have several other members of Sheriff Russell's family, including Travis Nipp for DUI, and other

cousins for rape and possession of marijuana, and even Sheriff Russell's own son Willie, for domestic assault.  (See Exhibit 4, Deposition of Russell, 28:13-28:17, 124:5-128:7).

30.      Sheriff Russell has even personally arrested Con Nipp four separate times.  (See Exhibit 4, Deposition of Russell, 242:1-242:12).

31.      Sheriff Russell has never not arrested someone because they are related to him; he is related to many people in Love County.  (See Exhibit 4, Deposition of Russell, 242:16-243:10).

32.      Sheriff Russell told Denney that they should wait until the a.m. to get a warrant as the Love County Jail facility was not capable of holding a blind man.  (See Exhibit 1, Deposition of Denney, 175:17-176:15, 177:24-178:3, 179:16-179:25; Exhibit 4, Deposition of Russell, 165:25-166:8).

33.      Russell has a duty to protect inmates in his charge, and was concerned about putting a very big liability on the Sheriff's Office if a blind man were to fall and hurt himself in the Love County Jail.  (See Exhibit 4, Deposition of Russell, 170:23-171:7, 256:3-256:14).

34.      No blind person has ever been housed at the Love County Jail.  (See Exhibit 1, Deposition of Denney, 208:13-208:25; Exhibit 4, Deposition of Russell, 252:5-252:9).

35.      The Love County Jail is a very, very small facility, without any available padded rooms.  (See Exhibit 1, Depo. of Denney, 209:1-209:11; Ex 4, Depo. of Russell, 250:24-251:8, 255:14-255:16).

36.      There is no nurse, infirmary, or doctor in the Love County Jail, so if an inmate injures themself, they have to be taken to the hospital.  (See Exhibit 4, Deposition of Russell, 69:23-70:8).

37.      Denney was nevertheless excited and worked up, and really wanted to arrest John Nipp and take him to jail.  (See Exhibit 1, Deposition of Denney, 180:1-180:22).

38.      Russell at this point attempted to call the District Attorney several times, but could

not get a hold of him at first.  Denney testified that when he could not immediately arrest John Nipp, he very loudly and argumentatively yelled at Sheriff Russell "If you're not going to let us do our fucking jobs, we should all fucking quit" and tossed his key fob to his Sheriff's Office patrol vehicle on the hood.  (See Exhibit 1, Deposition of Denney, 183:19-185:1, 185:23-186:5, 306:15-306:23; (See Exhibit 4, Deposition of Russell, 166:10-166:15).

39.    Denney does not, however, recall the exact words that were exchanged between him and Sheriff Russell.  (See Exhibit 1, Deposition of Denney, 290:2-290:7).

40.    Sheriff Russell testified that Denney rudely and loudly said: "Fuck it, I quit" or "Well, fuck it, then, I quit" and threw his key fob on the hood of the vehicle, and walked off.  (See Exhibit 4, Deposition of Russell, 167:18-167:21, 177:1-177:5, 257:23-258:15).

41.    Denney does not know whether Sheriff Russell perceived that he (Denney) had just quit his job.  Based on Denney's words, tone, and actions with the key fob, Russell in fact did perceive that Denney had just quit his job. (See Exhibit 1, Deposition of Denney, 204:20-204:24; Exhibit 4, Deposition of Russell, 177:6-177:10, 203:2-203:8, 258:16-259:15).

42.    Deputy Cody Blagg and Undersheriff Harvey Stewart both testified that they also viewed this incident, and perceived that Denney had quit his job as a Love County Deputy.   (See Exhibit 10, Affidavit of Cody Blagg; Exhibit 11, Affidavit of Harvey Stewart)

43.    Russell did not terminate Denney.  (See Exhibit 4, Depo. of Russell, 196:7-196:9).

44.    Reserve Deputy Larry Vaughn testified that he overheard Denney on the cell phone with someone, saying "that he [Denney] needed a ride because he had just quit his job."  While Denney claims he did not even have his cell phone on him, the cell phone records from Denney's cell phone number (580)768-1075 indicate that Denney made and received numerous calls on his cell phone between 10:37 p.m. on January 20, 2014 and 12:46 a.m. on January 21, 2014, including

7

to his wife's cell phone number (580) 768-0896. (See Exhibit 12, Affidavit of Larry Vaughn; Exhibit 15, AT&T Records from Denney's cell phone number, pp. 1-2; Exhibit 16, CLEET Notice of change of Address, p. 1; Exhibit 17, Driver Employment Application, p. 1).[1]

45.    Russell then finally got a hold of Tim Burson ("Burson") from the District Attorney's Office on Stewart's cell phone; Burson told Russell "do not let him arrest that blind man....have him fill out a report and bring it to me," to which Russell replied that Denney had quit, but was still standing there. (See Exhibit 4, Deposition of Russell, 167:22-168:16).

46.    Sheriff Russell told Reserve Deputies Larry Vaughn and Brett Harris that one of them needed to drive Denney's patrol car back to the Sheriff's Office, as Denney had just quit. (See Exhibit 4, Deposition of Russell, 169:10-169:17, 177:10-178:5; Exhibit 12, Affidavit of Larry Vaughn).

47.    Larry Vaughn did not have the opportunity to actually take Denney's patrol unit to the Sheriff's Office, because he was then sent to a residence down the road to pick up Jennifer Nipp to help obtain a statement from John Nipp. (See Exhibit 12, Affidavit of Larry Vaughn).

48.    While Denney was still standing on the scene, Denney also spoke on Stewart's cell phone with Burson; Denney testified that Burson told him (Denney) that Denney should write up a report in the morning, and send it over, to consider whether to obtain an arrest warrant. Denney claims he does not know if Burson had spoken with Sheriff Russell yet at this point. (See Exhibit

---

[1] The AT&T records are provided in UTC (Coordinated Universal Time). This Court should take judicial notice that as of January 20-21, 2014, Central Standard Time was six hours behind Coordinated Universal Time. Thus, all time-stamps on the AT&T records must be moved back six hours ahead to convert them into Central Standard Time. For example, a UTC time of 04:37:45 would actually have taken place at 10:37:45 p.m. Central Standard Time. (See also Exhibit 18, Navy UTC Conversion Chart; Exhibit 19, Explanation of when Central Standard Time would have converted into Daylight Savings time in 2014, not until March 9, 2014).

1, Deposition of Denney, 193:20-194:17, 196:22-197:2, 208:4-208:12).

49.     Stewart also spoke on the cell phone with Burson.  Burson told Stewart "Do not arrest that man [meaning John Nipp].  You cannot hold him in jail.  A report should be written up and sent to me, and if it is a legitimate case, a summons will be sent to John Nipp. " (See Exhibit 11, Affidavit of Harvey Stewart, Exhibit 4, Deposition of Russell, 168:17-168:22).

50.     Harvey Stewart then told Sheriff Russell that Burson had told him [Stewart] that John Nipp should not be arrested that night, but rather that Denney should write up a report and send it to the District Attorney. (See Exhibit 4, Deposition of Russell, 168:23-169:3)

51.     Sheriff Russell's decision not to arrest John Nipp that evening was based on his liability concerns over holding a blind man at the Love County Jail, and also that John Nipp was not a flight risk,  the severity of John Nipp's alleged crime, and the opinion of the District Attorney that a report should be written up instead of arresting him that evening.   The fact that John Nipp was Russell's uncle played no role in Russell's decision to not have John Nipp arrested that evening. (See Exhibit 4, Deposition of Russell, 165:25-166:8, 252:24-254:8).

52.     There is no law or policy of the State of Oklahoma requiring that John Nipp MUST have been arrested that evening; it was up to the Sheriff's discretion.  (See Exhibit 4, Deposition of Russell, 256:15-256:21).

53.     Denney claims that Undersheriff Stewart later told Denney that everything was said out of the heat of the moment, and that everything was fine.  However, Denney serves at the pleasure of the Sheriff, not the Undersheriff, and the Undersheriff does not have any authority to hire, fire, discipline, or rehire deputies. (See Exhibit 1, Deposition of Denney, 200:24-201:11; Exhibit 4, Deposition of Russell, 237:22-238:14, 260:12-260:15; Exhibit 11, Affidavit of Harvey Stewart).

9

54.     Denney does not know whether Undersheriff Stewart had actually talked to Sheriff Russell about Denney's job status.  (See Exhibit 1, Deposition of Denney, 201:25-202:8, 202:14-202:18).

55.     In fact, Harvey Stewart had not approached Russell or said anything to Russell about Denney's job status.  Any conversation Stewart  had with Denney was not under Russell's orders (See Exhibit 4, Deposition of Russell, 182:23-184:6, 260:9-260:11; Exhibit 11, Affidavit of Harvey Stewart).

56.     Sheriff Russell never told Denney that he had not quit, never told Denney that he still had a job, and never told Denney that everything was ok. (See Exhibit 1, Depo. of Denney, 205:7-206:5).

57.     Sheriff Russell assumed that Denney was still on the scene because he was waiting for someone to give a ride home, or that one of the deputies would give him a ride home; at that point, Sheriff Russell determined he was no longer needed at the scene, and went straight to bed at home.  (See Exhibit 4, Deposition of Russell, 188:8-188:19, 270:1-270:4).

58.     Larry Vaughn took Jennifer Nipp back home, and returned with John Nipp's wife. At that point, Vaughn noticed that Denney had already left the scene.  (See Exhibit 12, Affidavit of Larry Vaughn).

59.     Only the next day, January 21, 2014, Sheriff Russell learned that Denney had actually gotten in his unit later that night and went out on other calls.  Sheriff Russell had not known that Denney was doing this at the time that it occurred, and Denney had no right to go on those calls, as he had already quit.   (See Exhibit 4, Deposition of Russell, 188:20-188:23, 202:6-202:8, 278:4-278:20).

60.     On January 21, 2014, Sheriff Russell wrote up paperwork noting that Deputy Denney had quit the previous evening at approximately 12:30 a.m.  Russell also verbally reminded Denney that he had quit the previous evening.  (See Exhibit 1, Deposition of Denney, 213:11-214:8, 214:23-215:2, 225:12-225:15; Exhibit 13, January 21, 2014 Employment Action; Exhibit 4, Deposition of Russell, 205:2-205:9).

61.     Paragraph 17 of Plaintiff' Complaint, that "Sheriff Russell even threatened to terminate Plaintiff's employment should he refuse to release his uncle," is not true.  Sheriff Russell never threatened to terminate Plaintiff.  (See Exhibit 1, Deposition of Denney, 222:1-222:23).

62.     Denney has no evidence whatsoever that he was not an at-will employee, or that he was in any way entitled to a hearing before the conclusion of his employment with the Love County Sheriff's Office.  Sheriff Russell never told Denney he was entitled to perpetual employment, or that he was entitled to a hearing, not did anyone ever tell Denney that  he was entitled to a hearing.  No Love County Sheriff's Office employee ever had such a hearing.  Denney  was also never given any consideration to create a contractual relationship with the Sheriff's Office, and had no such contract with the Sheriff's Office.  (See  Exhibit 1, Deposition of Denney, 225:21-230:4, 234:6-235:7; Exhibit 4, Deposition of Russell, 267:17-268:13).

63.     Plaintiff  has no evidence whatsoever that the Board of County Commissioners was in charge of the Sheriff's Office's policies and procedures.  (See Exhibit 1, Depo. of Denney, 233:16-234:5).

64.     Plaintiff  cannot articulate any public policy in the State of Oklahoma that he claims was violated by Sheriff Russell. (See Exhibit 1, Deposition of Denney, 235:8-236:22).

11

65.     Denney claims that Brian Walker at the Garvin County Sheriff's Office told Denney that Sheriff Russell had told Garvin County Undersheriff Jim Mullett that Denney was a real "piece of shit." (See Exhibit 1, Deposition of Denney, 237:8-238:24).

66.     The alleged statement above in paragraph 65 is the only alleged statement Plaintiff is referring to in his defamation claim. (See Exhibit 1, Deposition of Denney, 239:23-240:20).

67.     Russell did not tell Garvin County Undersheriff Mullett that Denney was a "piece of shit." (See Exhibit 4, Deposition of Russell, 272:12-272:17).

68.     No law enforcement agency anywhere in Oklahoma ever contacted Sheriff Russell to ask for a reference, or for his opinion, regarding hiring Denney, nor has Sheriff Russell ever told any Sheriff not to hire Johnny Denney (See Exhibit 4, Depo. of Russell, 219:21-219:25, 275:20-275:23).

69.     Denney does not know why he did not get a job at the Garvin County Sheriff's Office, and in fact has never spoken directly to the Garvin County Sheriff. (See Exhibit 1, Deposition of Denney, 239:14-239:25, 240:21-240:25).

70.     Denney did not even start looking to work in law enforcement again until August 2014. Denney has continued working in law enforcement in the time since, working at the City of Wynnewood Police Department beginning in February 2015, and then the Carter County Sheriff's Office beginning in August 2015. (See Exhibit 1, Deposition of Denney, 245:5-248:20, 249:9-250:6).

71.     Plaintiff's Notice of Tort Claim was filed July 30, 2014. (See Exhibit 1, Deposition of Denney, 257:24-258:16; Exhibit 14, Tort Claim).

72.     Denney is not aware of anyone at the Love County Sheriff's Office ever being terminated for arresting someone.  (See Exhibit 1, Deposition of Denney, 308:12-308:14).

73.     The Love County Sheriff has a statutory duty to run the Love County Jail, and approves the Policies and Procedures regarding the operation of the Love County Jail.  (See Exhibit 4, Deposition of Russell, 238:22-240:6).

74.     Only the Sheriff, not the Board of County Commissioners, has the authority to hire, discipline, terminate, or reprimand deputies, and to approve the policies and procedures of the Sheriff's Office.  (See Exhibit 4, Deposition of Russell, 240:7-241:13).

## ARGUMENT AND AUTHORITY

### I.  STANDARD OF REVIEW

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.*  In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

13

## II.  DEFENDANT RUSSELL, IN HIS INDIVIDUAL CAPACITY, IS NOT LIABLE FOR DEFAMATION

Plaintiff brings only one claim against Sheriff Russell in his individual capacity, namely for defamation under state tort law.   First, to recover under a defamation theory (either libel or slander), a plaintiff generally must plead and prove (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication.  *See Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, ¶ 10, 987 P.2d 1218, 1223*; see also Tanique, Inc. v. State ex rel. Oklahoma Bureau of Narcotics and Dangerous Drugs*, 99 P.3d 1209, 1217, 2004 OK CIV APP 73, ¶ 29 (Okla. Civ.App. Div. 2,2004).[2]

While his Amended Complaint made general unspecified allegations that Sheriff Russell had "made false statements to third parties about Plaintiff's third parties," in his deposition Plaintiff alleged precisely one instance of alleged defamation; namely Plaintiff claimed that Brian Walker at the Garvin County Sheriff's Office told him [Plaintiff] that  Sheriff Russell had told Garvin County Undersheriff Jim Mullett that Denney was "a real piece of shit."  (See Undisputed Fact No. 65).  The alleged statement above in paragraph 65 is *the only* alleged statement Plaintiff is referring to in his defamation claim.   (See Undisputed Fact No. 66).  [3]  First and foremost, Plaintiff has no evidence

---

[2]Defendant Russell assumes, without taking a position either way, that Plaintiff is a not a "public figure."

[3]Plaintiff has articulated precisely one allegation of an alleged act of defamation.  Plaintiff should be barred from coming up with any new alleged acts of defamation on Response to this Motion for Summary Judgment.   To the extent Plaintiff does develop any new allegations of defamatory statements, Defendant Russell will discuss them on Reply. Defendant Russell specifically reserves the right to provide argument on any additional alleged defamatory statements if Plaintiff raises them for the first time at the summary judgment stage of this litigation.

that this statement was ever made.  In fact, Sheriff Russell did not tell Garvin County Undersheriff Mullett that Denney was a "piece of shit."  (See Undisputed Fact No. 67).   Plaintiff's only alleged evidence that this statement was made is hearsay within hearsay within hearsay.  Again, the entirety of Plaintiff's defamation claim is (1) that Brian Walker told Plaintiff that (2) Garvin County Undersheriff Mullett had told Brian Walker that (3) Sheriff Russell had told Undersheriff Mullett that Denney was a "piece of shit."  This inadmissible triple hearsay cannot be used to prevent summary judgment.  See *Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1210 (10th Cir. 2010).  (FRCP 56 does not provide that hearsay testimony which would be inadmissible at trial somehow becomes admissible simply by being included in an affidavit to defeat summary judgment).

Even if Plaintiff could prove that the statement was made, however, he cannot establish any of the elements of defamation.  He certainly cannot establish that any such alleged statement was a "false and defamatory statement concerning another," as any such statement would clearly be an opinion that cannot be proven false or correct, rather than a "false statement."  Moreover, Plaintiff cannot establish that any such alleged statement evidenced fault amounting at least to negligence, for the same reason described above; namely, one cannot be negligent in expressing an opinion.

Moreover, even if Plaintiff could establish that this alleged comment was false, defamatory, and made at least through negligence, the statement would be privileged, as  Defendant Russell would be entitled to the fair comment defense.

> The fair comment is a common-law defense to an action for defamation, which is generally privileged when it (a) *deals with* a matter of public concern, (b) *is based on* true or privileged facts, and (c) *represents* the actual opinion of the speaker, but is not made for the sole purpose of causing harm. The fair-comment privilege developed because common-law courts early recognized that actions for defamation could frustrate the valuable discourse fostered by the free flow of evaluative ideas. Rodney A. Smolla, Law of Defamation § 6.02[1] (1994). In its earliest form, the privilege provided limited protection for expressions of opinion. Over time, fair comment was deemed to protect expressions of opinion about the conduct of public officials and

15

political candidates regardless of the reasonableness of the opinion. *Id.* As one commentator observed, "[I]t must be conceded that fair comment sometimes enables journalists and others to escape liability for defamatory language which offends the taste and moral sense of a substantial part of the community. This occasional abuse is part of the price of free speech...." Note, *Fair Comment,* 62 Harv.L.Rev. 1207, 1216 (1949). According to the majority rule, the privilege applies only to an expression of opinion, not to a false statement of fact, whether it is expressly stated or implied in an expression of opinion.

*Gaylord Entertainment Co. v. Thompson*, 1998 OK 30, 958 P.2d 128, 145 n.62 (internal citations omitted)

Here, any such alleged comment, even as alleged by Plaintiff ( if it was made) would clearly (1) deal with a matter of public concern, namely the job performance of a law enforcement officer in the community, (2) would be based on true facts, namely Plaintiff's involvement in an altercation with John Nipp, and (3) would represent the opinion of the speaker, Plaintiff therefore cannot establish that any such alleged comment was unprivileged.

Next, Plaintiff cannot establish the final element of a defamation claim either, namely the existence of special damage caused by the publication.  To the extent that Plaintiff is claiming that this alleged  statement was the reason he did not get a job at the Garvin County Sheriff's Office, Denney actually does not know why he did not get a job at the Garvin County Sheriff's Office, and in fact has never spoken directly to the Garvin County Sheriff. (See Undisputed Fact No. 69).  In fact, no law enforcement agency anywhere in Oklahoma ever contacted Sheriff Russell to ask for a reference, or for his opinion, regarding hiring Denney, nor has Sheriff Russell ever told any Sheriff not to hire Johnny Denney  (See Undisputed Fact No. 68).   Moreover, Denney did not even start looking to work in law enforcement again until August 2014.  Denney has continued working in law enforcement in the time since, working at the City of Wynnewood  Police Department beginning in February 2015, and then the Carter County Sheriff's Office beginning in August 2015.  (See

16

Undisputed Fact No. 70). Plaintiff therefore cannot establish special damages caused by the publication, the final element of a defamation claim, either. (Plaintiff makes no allegation that the statement is actionable irrespective of special damages).

For all of these reasons, Defendant Russell in his individual capacity is entitled to summary judgment on Plaintiff's defamation claim.[4]

### III. CONCLUSION

For all the reasons discussed above, all claims against Defendant Russell, in his individual capacity,  must be dismissed as a matter of law.

---

[4]Plaintiff's lawsuit is brought ONLY against Joe Russell in his individual capacity. (Dkt. 4, p. 1).  However, in his third count of defamation, Plaintiff states: "Sheriff Russell, in his capacity as Sheriff of Love County and/or his individual capacity made false statements to third parties about Plaintiff's work performance." (Dkt. 4, p. 7).  Pursuant to Okla. Stat. tit. 51, § 152(7) of the OGTCA, Defendant Joe Russell, as Sheriff of Love County, is an employee of the Board of County Commissioners of Love County.  To the extent Plaintiff is attempting  to additionally bring suit against Sheriff Russell in his official capacity under state tort law (and it is not clear whether Plaintiff is attempting to do this), a "[s]uit against a government officer in his or her official capacity is actually a suit against the entity that the officer represents and is an attempt to impose liability upon the governmental entity." *Speight v. Presley*, 2008 OK 99, ¶ 20, 203 P.3d 173, 179 (citing *Pellegrino v. State ex rel. Cameron University*, 2003 OK 2, ¶¶ 5-6, 63 P.3d 535, 537).  Such "official capacity" claims are improper for the purposes of state tort law  under the OGTCA and Defendant Russell would be immune from suit under that capacity.  *Id.* Plaintiff therefore fails to set forth a claim or cognizable legal theory against Sheriff Russell in his official capacity, even if he is attempting to do so.

Respectfully submitted,


/s/ Jordan L. Miller
Jordan L. Miller, OBA No. 30892
Chris J. Collins, OBA No. 1800
COLLINS, ZORN & WAGNER, P.C.
429 NE 50th, Second Floor
Oklahoma City, Oklahoma 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: Jordan@czwglaw.com
          cjc@czwglaw.com

ATTORNEYS FOR DEFENDANTS
BOARD OF COUNTY COMMISSIONERS
OF LOVE COUNTY, OKLAHOMA AND
JOE RUSSELL, in his individual capacity


## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Dane J. Flesch
Tony Gould
George H. Brown
Robert W. Henderson
Brown & Gould, PLLC
136 N.W. 10th Street, Suite 200
Oklahoma City, OK  73103


/s/ Jordan L. Miller
Jordan L. Miller

18